**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT COURT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

| | |
|---|---|
| SLEP-TONE ENTERTAINMENT CORPORATION, | Case No.: |
| Plaintiff, | **COMPLAINT** |
| v. | **TRADEMARK INFRINGEMENT, § 15 U.S.C. 1114** |
| ISLAND RESORT COMPANY, LLC, AND JOHN DOE, hereby named to represent the unknown owner(s) of ISLAND RESORT COMPANY, LLC, | **UNFAIR COMPETITION, § 15 U.S.C. 1125 VIOLATION OF SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT, S.C. CODE ANN. §§ 39-5-20, et. seq.** |
| Defendants. | **JURY TRIAL REQUESTED** |

## COMPLAINT

The Plaintiff, Slep-Tone Entertainment Corporation (hereinafter "Slep-Tone"), by its undersigned counsel, hereby complains of the Defendants, Island Resort Company, LLC (hereinafter "Island Resort"), and John Doe (hereinafter "John Doe" and collectively with Island Resort, the "Defendants") and for its Complaint alleges as follows:

## INTRODUCTION

Slep-Tone is the manufacturer and distributor of karaoke accompaniment tracks sold under the name "Sound Choice." Slep-Tone was founded twenty nine (29) years ago by Kurt and Derek Slep, two brothers with a vision to nurture the development of karaoke in America as a participatory entertainment phenomenon. During that time, Sound Choice came to be recognized as one of the leading producers of high-quality karaoke accompaniment tracks. The company invested over Eighteen Million and no/100 Dollars ($18,000,000.00) to re-record and replicate the authentic sound of popular music across different eras and genres of music.

1

The Sleps' dedication to producing music of the highest quality and the most authentic character led its music to become the staple of almost every karaoke show in the country.  As karaoke grew in popularity, Sound Choice became the brand that nearly every karaoke fan wanted to sing and that nearly every karaoke jockey, karaoke host, or karaoke operator ("KJ"). wanted in his or her or their library.

KJs play karaoke songs using compact discs containing files written in one of two special encoded formats, either "CD+G" ("compact disc plus graphics") or "MP3G" ("MP3[1]) plus graphics"), in which the disc contains the music and the lyrics, which will display on a screen. In recent years, computer technology, cheap file memory devices, and the internet have made it possible for karaoke discs to be decoded and "ripped" (copied) to a user's hard drive and easily copied and distributed between KJs.  This technology has proven irresistible to KJs, many of whom have used this opportunity to copy one purchased disc to several different computer based systems, copy a singer's personal discs if they use them during a show, "swap" song files among each other, download them from illegal file-sharing sites and build libraries of tens of thousands of karaoke songs without paying for them.  Whereas in the past a KJ would buy multiple copies of an original disc if he or she or they desired to operate multiple systems, now they simply "clone" their songs for multiple commercial systems or even their entire karaoke song libraries to start a new operation.  Additionally, many KJs starting in the business simply buy computer drives pre-loaded with thousands of illegally copied songs.

---

[1] MP3 is an acronym standing for "Moving Picture Experts Group Audio Layer 3."  MP3G is a far newer format than CD+G and is significantly more portable than CD+G.  Slep-Tone has only recently begun distributing its karaoke tracks in this format, and only under tight contractual controls that require user registration and audits, confine possession to professional karaoke operators, include serialization of licensed discs, and prohibit file sharing under pain of forfeiture of license rights.

These practices have become so widespread that Slep-Tone has been driven nearly out of business.  At its peak, Sound Choice employed 75 individuals and produced as many as 5 new karaoke discs per month.  Today, the enterprise employs only 4 individuals.  Sound Choice Studios, which was responsible for production of new material, was driven out of business and the assets sold to ex-employees because the companies lost money on every recent new karaoke disc.  The most recent new disc did not produce enough revenue even to cover the production and licensing costs associated with it—yet the songs from that disc can be found on as many as forty thousand (40,000) karaoke systems around the United States.  Because its primary purpose was to record new music for karaoke and it could no longer profitably produce new music, it was shut down.  In the future Sound Choice will have to subcontract to the ex-employees if/when it is able to profitably release new titles again.

For KJs, karaoke is a commercial enterprise.  KJs who legitimately acquired all of their music at great cost are being forced by illicit competition to produce shows for lower and lower fees.  Illegitimate competitors offer libraries of tens of thousands of songs, which would have cost Fifty Thousand and no/100 Dollars ($50,000.00) to One Hundred Thousand and no/100 Dollars ($100,000.00) or more to acquire legitimately, but produce shows for one-third the rates a legitimate KJ can offer.  The result is significant financial pressure on once-legitimate KJs to skirt or ignore the law and become pirates, simply to stay in business.

Slep-Tone has been forced to undertake this litigation in order to ensure that it survives and continues to produce the high-quality karaoke music its fans demand and to level the playing field for the legitimate KJs.

## JURISDICTION AND VENUE

1.      This is an action for trademark infringement and unfair competition arising under §§ 32 and 43 of the Trademark Act of 1946, 15 U.S.C. §§ 1114 and 1125.  This Court has exclusive jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States.

2.      This Court further has jurisdiction pursuant to 28 U.S.C § 1338(a), in that this civil action arises under an Act of Congress relating to trademarks, and, as to Slep-Tone's Lanham Act unfair competition claim, pursuant to 28 U.S.C. § 1338(b), in that the claim is joined with a substantial and related claim under the trademark laws of the United States.

3.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because all of the Defendants reside in this State and judicial district.

4.      This Court has personal jurisdiction over each of the Defendants, in that each of them resides in this State and judicial district and conducts significant business here, and in that the acts of which Defendants stand accused were undertaken in this State and judicial district.

## THE PLAINTIFF

5.      Plaintiff Slep-Tone is a North Carolina corporation having its principal place of business in Pineville, North Carolina.

## THE DEFENDANTS

6.      Upon information and belief, Island Resort is a limited liability company organized under the State of South Carolina, which conducts business activities in an establishment known as Sandals Lounge at the Sands Ocean Club at least in Myrtle Beach, SC. Island Resort is engaged in the business of providing karaoke entertainment in this State.

7.      John Doe is named in a representative capacity for the unknown owner(s) of Island Resort, who, upon information and belief, reside(s) in the State of South Carolina and

conduct(s) business activities at least in Myrtle Beach, SC.  John Doe is engaged in the business of providing karaoke entertainment in this State.

8.     The foregoing Defendants are collectively referred to as the "Defendants" and individually as a "Defendant."

## BACKGROUND FACTS

9.     The term "karaoke" means "empty orchestra" in Japanese.    Karaoke entertainment has grown into a multi-million dollar business in the United States.

10.     Slep-Tone is one of the leading United States manufacturers of karaoke accompaniment tracks.

11.     Slep-Tone's manufacturing process involves re-recording popular songs in the style of a particular performer, but without the lead vocals, and synchronizing the music to a display of the lyrics in a manner that gives cues to the performer as to what and when to sing.

12.     Karaoke compact disc plus graphics or MP3 plus graphics recordings contain re-created arrangements of popular songs for use as accompaniment tracks.

13.     Typically, the lead vocal tracks in an accompaniment track are omitted so that a karaoke participant can sing along, as though he or she were the lead singer.  In other situations, the lead vocal track by a sound-alike artist might be included, and some formats allow the lead vocal to be selectively muted upon playback so that the accompaniment track may be listened to either with or without the lead vocals.

14.     The "graphics" portion of a karaoke recording refers to the encoding of the recording with data to provide a contemporaneous video display of the lyrics to the song, in order to aid the performer.

15.     This graphics data is also utilized to mark the accompaniment tracks with the Sound Choice trademarks and to cause the Sound Choice trademarks to be displayed upon playback.

16.     Entertainers who provide karaoke services in bars, restaurants, and other venues are known as karaoke jockeys, karaoke hosts, or karaoke operators ("KJs").  The services provided by KJs typically include providing the karaoke music and equipment for playback, entertaining the assembled crowd for warm-up purposes, and organizing the karaoke show by controlling access to the stage, setting the order of performance, and operating the karaoke equipment.

17.     Typically, a KJ will maintain a printed catalog of songs available for performance in order to aid participants in selecting a song to sing.

18.     Legitimate KJs purchase equipment and purchase or license compact discs containing accompaniment tracks and charge for the above-mentioned karaoke services.

19.     Many KJs, such as some of the present Defendants, obtain, copy, share, distribute and/or sell media-shifted copies of the accompaniment tracks via pre-loaded hard drives, USB drives, CD-R's, or the Internet.

20.     Some KJs copy the accompaniment tracks from compact discs to computer hard drives or other media, an activity known as "media-shifting."

21.     In many cases, media-shifting also involves converting the compact disc files to a different format, such as from CD+G format to MP3G format or WAV+G format; this is referred to as "format-shifting."

22.     Both media-shifting and format-shifting involve the creation of copies of the original materials stored on the compact discs.

23.     Upon information and belief, and based upon investigation of their activities, the present Defendants are in possession of unauthorized media-shifted and format-shifted copies of karaoke accompaniment tracks which have been marked falsely with Slep-Tone's federally registered trademarks.

24.     Slep-Tone does not authorize media-shifting or format-shifting of its accompaniment tracks for any commercial purpose.  Slep-Tone does, however, tolerate media-shifting and format-shifting under very specific conditions.

25.     Slep-Tone's conditions for tolerance of media-shifting and format-shifting include, without limitation, that (a) that each media-shifted or format-shifted track must have originated from an original, authentic compact disc; (b) that the tracks from the original, authentic compact disc be shifted to one, and only one, alternative medium at a time; (c) that the KJ maintain ownership and possession of the original, authentic compact disc for the entire time that the media-shifted or format-shifted tracks are in existence; (d) that the original, authentic compact disc not be used for any commercial purpose while its content has been shifted; and (e) that the KJ notify Slep-Tone that he or she (or they) intends (intend) to conduct or has conducted a media-shift or format-shift, and submits to a verification of adherence to Slep-Tone's policy.

26.     Media-shifting or format-shifting that occurs outside the conditions of tolerance described above is entirely without authorization or tolerance.

27.     Each of the Defendants has been observed using media-shifted and/or format-shifted karaoke accompaniment tracks marked with Slep-Tone's registered trademarks for commercial purposes.

28.    Defendants have been observed displaying Slep-Tone's registered trademarks to their customers or potential customers for purposes of advertising to their customers the quality and superiority that is associated with Slep-Tone products.

29.    Defendants have been observed displaying the registered marks to attract more customers and retain loyal customers, all of whom recognize the quality and superiority of Slep-Tone products.  Defendants directly benefit from the advertisement of Slep-Tone's registered trademarks.

30.    Without exception, Defendants' media-shifting activities have been undertaken outside the conditions of tolerance described above.

31.    A karaoke accompaniment track that exists outside the conditions of tolerance described above and that has been marked with Slep-Tone's federally registered trademarks is a counterfeit.

32.    Slep-Tone pays statutory and negotiated royalties to the owners of copyright in the underlying musical works for their activities in legitimately creating, copying, distributing, and selling compact discs containing karaoke accompaniment tracks.

33.    Those persons, including Defendants, who illegitimately obtain, copy, share, distribute, and/or sell media-shifted copies of Slep-Tone's accompaniment tracks do not pay royalties to the owners of copyright in the underlying musical works.

34.    Slep-Tone and its affiliated companies have spent millions of dollars building and maintaining studios, hiring artists, building a distribution facility, paying royalties to copyright owners, building a company that is capable of reliably producing high-quality karaoke versions of current and historical musical hits and building a brand that is one of the pre-eminent brands in the industry.

35.    The widespread creation, distribution and commercial use of counterfeit copies of Slep-Tone's karaoke discs, including by these Defendants, has denied Slep-Tone the benefit of its investments.

36.    These counterfeits include Slep-Tone's registered trademarks, such that to the consumers of the illegitimate KJs' services, the counterfeits are virtually indistinguishable from genuine SOUND CHOICE® materials.

37.    For each of the most recent releases of new karaoke music by Slep-Tone, dozens of illegitimate copies of the contents of each disc have been created, on average, for each legitimate copy sold.  Slep-Tone, its affiliated companies, and its licensors have lost a considerable amount of money due to this widespread piracy.

38.    Such widespread illegal copying of music has been made possible by improving and ever cheaper computer technology and memory devices and the easy distribution of digital content over the internet.

39.    Widespread pirating of songs has contributed to the loss of more than seventy (70) jobs at Slep-Tone's location in Pineville, North Carolina, as well as several consecutive years of operating losses, as revenues do not cover fixed costs.

40.    Legitimate KJs spend thousands of dollars acquiring Slep-Tone's accompaniment tracks, an irreducible overhead cost that must be recovered over a significant number of engagements.

41.    Illegitimate KJs, including these Defendants, have an unfair advantage over legitimate KJs, because the illegitimate KJs are able to provide karaoke services with a considerably lower overhead cost and significantly more songs through the pirating of Slep-Tone's tracks.

42.    Piracy, therefore, unfairly increases the profits of illegitimate KJs and unfairly decreases the profits of legitimate KJs, a condition that pressures legitimate KJs to either commit piracy instead of doing business with Slep-Tone and other karaoke music producers or lose their singers to KJs offering more songs at cheaper prices at other venues.

43.    Because of piracy, it is nearly impossible for legitimate KJs to compete against illegal KJs, who are able to provide less expensive karaoke services and a greater number of tracks due to their lower overhead costs.

44.    Even when illegitimate KJs have been forced through legal action or agreement to destroy their counterfeit copies of Slep-Tone's tracks, the illegitimate KJs continue to engage in unfair competition using pirated materials belonging to other manufacturers.

45.    This unfair competition harms Slep-Tone, despite the elimination of counterfeit copies of Slep-Tone's tracks, because the continuing piracy of other manufacturers' tracks exerts continuing pressure upon Slep-Tone's customers and potential customers to commit piracy of Slep-Tone's tracks.  Further, the greater number of tracks on pirate systems makes it more difficult for legal hosts to get hired and thus have the revenue to purchase Slep-Tone's products.

46.    In order to build a large library of Slep-Tone's accompaniment tracks, a legitimate KJ could expect to spend approximately Twenty Five Thousand and no/100 Dollars ($25,000.00) for each karaoke system upon which that library would be used.  For a comprehensive library of Slep-Tone's accompaniment tracks, that figure would rise to Forty Thousand and no/100 Dollars ($40,000.00) or more.

## SLEP-TONE'S RIGHTS

47.    Slep-Tone is the owner of U.S. Trademark Registration No. 1,923,448, issued October 3, 1995, and renewed once, for the trademark SOUND CHOICE, for "pre-recorded

magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions."

48.     Slep-Tone is the owner of U.S. Service Mark Registration No. 4,099,045, issued February 14, 2012, for the trademark SOUND CHOICE, for "conducting entertainment exhibitions in the nature of karaoke shows."

49.     Slep-Tone is the owner of U.S. Trademark Registration No. 2,000,725, issued September 17, 1996, and renewed once, for a display trademark as follows:



for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions."

50.     Slep-Tone is the owner of U.S. Service Mark Registration No. 4,099,052, issued February 14, 2012, for the same display trademark as in the preceding paragraph, for "conducting entertainment exhibitions in the nature of karaoke shows."

51.     Slep-Tone has, for the entire time its marks identified above ("the Sound Choice Marks") have been federally registered, provided the public, including Defendants, with notice of those federal registrations through the consistent display of the symbol ® with its marks as used.

52.     Principally, the Sound Choice Marks are indicators of Slep-Tone as the origin of karaoke accompaniment tracks, meaning that those marks indicate that the tracks to which they are applied were made and distributed by Slep-Tone or at its direction and under its control.

53.     Slep-Tone is the owner of distinctive and protectable trade dress associated with its graphical displays ("the Trade Dress"). This distinctive and protectable trade dress includes,

at a minimum, (a) the use of a particular typeface, style, and visual arrangement in displaying the lyrics; (b) the use of particular colors to display lyrics set against a black background; (c) the Sound Choice Marks; and (d) the use of particular styles in displaying entry cues for singers, namely a series of vanishing rectangles to indicate the cue.

54.    Slep-Tone has used its trade dress continuously and substantially exclusively for a period of decades.

55.    The individual and collected elements of the Trade Dress have acquired secondary meaning as an indicator of Slep-Tone as a source, effectively functioning as a visual trademark.

56.    The Trade Dress serves to distinguish Slep-Tone's tracks from the tracks of its competitors, such that persons who are even minimally frequent consumers of karaoke entertainment services such as those provided by these Defendants are capable of identifying a particular karaoke track as originating with Slep-Tone simply by examining the Trade Dress or any significant portion thereof, whether or not the Sound Choice Marks are also displayed.

57.    The elements of the Trade Dress represent specific design choices by Slep-Tone; they are but one of many ways to convey the information necessary to permit a karaoke singer to be appropriately supported in his or her performance.

58.    No competitor of Slep-Tone is required to use any element of the Trade Dress to accomplish the lyric cueing, and indeed all of Slep-Tone's known competitors are known to use other trade dress in accomplishing the lyric cueing.

## INVESTIGATION OF DEFENDANTS' ACTIVITIES

59.    Slep-Tone has conducted an extensive investigation of the operations of Defendants, including by attending one or more public karaoke shows put on by Defendants and/or Defendants' employees, agents, representatives or contractors.

60.    Defendants have been observed possessing, using, or authorizing the use and display of unauthorized counterfeit goods bearing the Sound Choice Marks, or has provided, advertised or authorized from the provision of services in connection with the Sound Choice Marks without authorization or tolerance from, or indeed notice to, Slep-Tone.

61.    Defendants have been observed providing services in connection with the Sound Choice Marks, and have advertised Defendants' provision of or availability to provide karaoke services in connection with which the Sound Choice Marks have been used.

62.    Defendants have knowingly benefited from the possession, use and display of unauthorized counterfeit goods bearing the Sound Choice Marks.

63.    Defendants' activities are not isolated or sporadic occurrences, but are instead regular activities undertaken over a long period of time, in some cases months or years, depending upon when the activity was commenced.

64.    Defendants' acts of infringement are of a commercial nature, in that Defendants engaged in the acts with the transfer of money from one party to another as the principal motivation for providing the services.

65.    Defendants employ a library of karaoke music that contains unauthorized counterfeit goods bearing the Sound Choice Marks, including media-shifted karaoke tracks.

66.    Defendants have not obtained the permission of Slep-Tone to conduct media-shifting of Slep-Tone's music from original discs to an alternative medium, such as a computer hard drive.

67.    Defendants have not notified Slep-Tone of Defendants' intent to conduct media-shifting of Slep-Tone's music for commercial purposes.

68.    Defendants have not submitted to and passed an audit of Defendants' karaoke system(s) for the purposes of verifying Defendants' compliance with Slep-Tone's media-shifting policy.

69.    Defendants' piracy of accompaniment tracks is not limited to Slep-Tone's tracks.

70.    Upon information and belief, Defendants have committed acts of piracy of other manufacturers' accompaniment tracks, utilizing the words, names, symbols, and other devices associated with those manufacturers, upon information and belief without authorization.

71.    Defendants knew, or should have known under the circumstances, that Defendants were obtaining and using counterfeit karaoke tracks.

72.    Upon information and belief, Defendants, through an employee or contractor, operates a karaoke system to produce karaoke shows in which counterfeit goods bearing the Sound Choice Marks and Trade Dress are being used.

73.    Defendants, their employee, agent, representative or contractor were observed on at least one (1) occasion within the past year repeatedly displaying the Sound Choice Marks and the Trade Dress in connection with the provision of karaoke services in Myrtle Beach, SC without right or license.

74.    Based upon the popularity of Slep-Tone's music and the size of Defendants' library, Slep-Tone has a good-faith belief that discovery will show that Defendants:

a.    are in possession of unauthorized counterfeit goods bearing the Sound Choice Marks and/or the Trade Dress; and/or

      b.      knowingly benefit from and has the capacity to control the infringing conduct of others.

## DAMAGES

75.      Defendants' unauthorized use of Slep-Tone's trademarks has damaged Slep-Tone.

76.      Defendants have damaged Slep-Tone in an amount to be proven at trial, but not less than Twenty Five Thousand and no/100 Dollars ($25,000.00) for each karaoke system Defendants operate.  This figure is based upon the estimated minimum cost of acquiring, through legitimate means, a single set of copies of the material that each of the Defendants has pirated.

77.      Upon information and belief, by exerting illegitimate and unfair pressure upon the market for karaoke services in this area through the use of pirated material belonging to Slep-Tone and to other manufactures, Defendants have jointly cost Slep-Tone in excess of One Hundred Thousand and no/100 Dollars ($100,000.00) in revenue from the legitimate sources crowded out of the market by Defendants' piracy.

78.      Upon information and belief, Defendants have also enjoyed years of revenues attributable in substantial part to its use of counterfeit SOUND CHOICE-branded karaoke tracks to provide karaoke services for money.

79.      Defendants' illicit activities have also allowed them to compete unfairly against Slep-Tone's legitimate customers by lowering the cost of doing business through piracy of the music materials they use.

80.      Those illicit activities exerted illegitimate and unfair pressure upon the market for karaoke services in the areas in which Defendants operate by helping to crowd higher-cost but legitimate operators out of the market.

81.    Defendants' acts deprived Slep-Tone of revenue by discouraging legitimate operators from investing in legitimate SOUND CHOICE-branded products.

**FIRST CLAIM FOR RELIEF**
**TRADEMARK AND TRADE DRESS INFRINGEMENT**
**UNDER § 15 U.S.C. 1114**
**(Against All Defendants)**

82.    Slep-Tone realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein, and incorporates them herein by reference.

83.    Defendants used, or authorized or directly benefited from the use of, a reproduction, counterfeit, or copy of the Sound Choice Marks, or of the Trade Dress, or both, in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the Sound Choice Marks, or of the Trade Dress, or both, and by displaying the reproduction, counterfeit, or copy of the Sound Choice Marks, or of the Trade Dress, or both, during the provision of those services.

84.    Defendants' use of the Sound Choice Marks, or of the Trade Dress, or both, was "in commerce" within the meaning of the Trademark Act of 1946 as amended.

85.    Slep-Tone did not license Defendants to manufacture or acquire reproductions, counterfeits, or copies, or to use the Sound Choice Marks, or the Trade Dress, or both, in connection with the provision of their services.

86.    Defendants' use of the Sound Choice Marks, or of the Trade Dress, or both, is likely to cause confusion, or to cause mistake, or to deceive Defendants' customers and patrons into believing that Defendants' services are being provided with the authorization of Slep-Tone and that Defendants' music libraries contain bona fide Sound Choice accompaniment tracks.

87.    The acts of Defendants were willful.

88.    Slep-Tone has been damaged by infringing activities of Defendants.

89.    Unless enjoined by the Court, Defendants' infringing activities as described above will continue unabated and will continue to cause harm to Slep-Tone.

**SECOND CLAIM FOR RELIEF**
**UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)**
**(Against All Defendants)**

90.    Slep-Tone realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein, and incorporates them herein by reference.

91.    On each occasion when Defendants caused or permitted a Slep-Tone accompaniment track to be played during a karaoke show, Defendants displayed the Sound Choice Marks, or the Trade Dress, or both, in connection with Defendants' karaoke services.

92.    The display of the Sound Choice Marks, the Trade Dress, or both, is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that Slep-Tone sponsored or approved the Defendants' services and commercial activities.

93.    The display of the Sound Choice Marks, the Trade Dress, or both, is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by Slep-Tone and legally purchased or otherwise licensed by Defendants.

94.    Defendants' use of the Sound Choice Marks, the Trade Dress, or both, in this fashion would have inured to the benefit of Slep-Tone if Defendants had legitimately acquired genuine Sound Choice discs instead of counterfeiting them or acquiring the counterfeit goods, in that Slep-Tone would have received revenue from such sales.

95.    Because Slep-Tone has been denied this revenue, it has been damaged by Defendants' activities.

96.    On each occasion when Defendants caused an accompaniment track pirated from another manufacturer to be played during a karaoke show, Defendants displayed the words, names and symbols of the other manufacturer in connection with Defendants' karaoke services.

97.    Upon information and belief, Defendants' use of those words, names and symbols falsely designates the other manufacturer as the origin of the pirated track, when in fact the pirated copy was made or acquired by Defendants or another unauthorized provider.

98.    The display of these false designations of origin is likely to cause confusion, or to cause mistake or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the pirated tracks are legitimate, authorized and authentic materials that Defendants acquired in a legitimate manner.

99.    The display of the false designations of origin is also likely to cause confusion or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by those manufacturers and legally purchased by Defendants.

100.    Defendants' use of the false designations of origin in this fashion damages Slep-Tone by enabling Defendants to provide karaoke services at a lower cost than persons who acquire those materials legitimately, including Slep-Tone's legitimate customers.

101.    The consequential denial of revenue from a legitimate market for Slep-Tone's customers' services prevents Slep-Tone's customers from making purchases of material from Slep-Tone and is thus a denial of revenue to Slep-Tone.

102.    Because Slep-Tone has been denied this revenue, it has been damaged by Defendants' false designations of origin relating to other manufacturers.

103.    Unless enjoined by the Court, Defendants' unfair competition activities as described above will continue unabated and will continue to cause harm to Slep-Tone.

### THIRD CLAIM FOR RELIEF
### VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT
### UNDER S.C. CODE ANN. §§ 39-5-20, et. seq.
### (Against All Defendants)

104.    Slep-Tone realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein, and incorporates them herein by reference.

105.    The conduct of Defendants as described above constitutes unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce, and such conduct, therefore, violates the South Carolina Unfair Trade Practices Act., S.C. Code Ann. §§ 39-5-20, *et. seq*.

106.    Defendants' use of the Sound Choice Marks, or of the Trade Dress, or both, is likely to cause confusion, or to cause mistake, or to deceive Defendants' customers and patrons into believing that Defendants' services are being provided with the authorization of Slep-Tone and that Defendants' music libraries contain bona fide Sound Choice accompaniment tracks.

107.    Defendants' conduct also affects the public interest, is capable of repetition and, upon information and belief, has been repeated on numerous occasions as evidenced by the various shows Defendants performed and continue to perform.

108.    As a direct and proximate result of Defendants' acts of infringement, Slep-Tone has suffered an ascertainable pecuniary loss, to wit: the loss of revenue associated with sales or distribution of compact discs to KJs, commensurate with the demand for the contents of those discs, which revenue would have been received but for Defendants' acts in creating or acquiring counterfeits of Slep-Tone's accompaniment tracks.

109.    As the direct and proximate result of the unfair methods of competition and unfair or deceptive acts and practices of Defendants, Slep-Tone has sustained injury and is entitled to recover actual damages in an amount to be proven at trial.

110.    Defendants' use or employment of the unfair methods of competition and unfair or deceptive acts or practices was a willful and knowing violation of S.C. Code Ann. §§ 39-5-20, et. seq., and, as a result, Slep-Tone is entitled to recover from Defendants three times the actual damages that it has sustained under S.C. Code Ann. § 39-5-140.

111.    Slep-Tone is further entitled to recover its reasonable attorney's fees and court costs from the Defendants under S.C. Code Ann. § 39-5-140.

## PRAYER FOR RELIEF

WHEREFORE, Slep-Tone prays for judgment against Defendants, jointly and severally, and that the Court:

A.    Find that Defendants have committed acts of infringement, including, but not limited to counterfeiting, of the federally registered Sound Choice Marks and of the Trade Dress;

B.    Find that Defendants have engaged in unfair competition detrimental to Slep-Tone in violation of 15 U.S.C. § 1125(a);

C.    Find that Defendants have engaged in unfair methods of competition and unfair or deceptive acts or practices detrimental to Slep-Tone in violation of the South Carolina Unfair Trade Practices Act., S.C. Code Ann. §§ 39-5-20, *et. seq.*;

D.    Enter judgment against Defendants, jointly and severally, and in favor of Slep-Tone;

E.    Find the that Defendants' activities were in all respects conducted willfully and for profit;

F.      Award to Slep-Tone Defendants' profits and the damages sustained by Slep-Tone because of Defendants' conduct in infringing the Sound Choice Marks, the Trade Dress, or both, or, in the alternative, statutory damages per trademark infringed by counterfeiting in an amount up to Two Million and no/100 Dollars ($2,000,000.00) per mark infringed, per Defendant and in any event in an amount not less than Twenty Five Thousand and no/100 Dollars ($25,000.00) for each karaoke system operated by Defendants, and not less than Fifty Thousand and no/100 Dollars ($50,000.00) for each establishment in which the infringement occurred;

G.      Award to Slep-Tone treble, punitive, or otherwise enhanced damages, as available, for Defendants' acts of willful infringement;

H.      Order all computer disks, drives, or other media belonging to Defendants, which media contain illegal counterfeits of the Sound Choice Marks, of the Trade Dress, or of marks belonging to other manufacturers, to be delivered up for destruction;

I.      Grant Slep-Tone preliminary and permanent injunctive relief against further infringement of the Sound Choice Marks and the Trade Dress by Defendants;

J.      Grant Slep-Tone preliminary and permanent injunctive relief against further false designations of origin by Defendants with respect to words, names, and symbols associated with other manufacturers;

K.      Award Slep-Tone its costs of suit and attorneys' fees, to the extent not awarded above; and

L.      Grant Slep-Tone such other and further relief as justice may require.

Respectfully submitted this the 12th day of November, 2014.

JOLLEY LAW GROUP, LLC


_s/Michael C. Cerrati ___
Kelly M. Jolley, Esq. (Fed. ID No. 9578)
Michael C. Cerrati, Esq. (Fed. ID No. 10488)
P.O. Box 22230
Hilton Head Island, SC 29925
843-681-6500 office
877-513-3444 fax
mcc@jolleylawgroup.com
*Attorneys for Plaintiff*